# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| DAVID KELLEY | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. |
| | ) |
| HOLDER CONSTRUCTION, | ) JURY TRIAL DEMANDED |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

### STATEMENT OF JURISDICTION

1. This is a suit authorized and instituted pursuant to 42 U.S.C. §2000e, et.seq., known as Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 1981. This Court has original jurisdiction, pursuant to 28 U.S.C. §1331, as this civil action arises under the laws of the United States cited above. This Court also has original jurisdiction, pursuant to 28 U.S.C. §1343(a), as this civil action seeks to secure the protection of, and to redress the deprivation of, rights secured by Title VII and Section 1981 providing for injunctive and other relief against race discrimination and retaliation.

2. Venue is proper in this district, pursuant to 28 U.S.C. §1391, as all or a substantial part of the events or omissions giving rise to the claims occurred in Madison County, Alabama located within this judicial district.

3. Plaintiff David Kelley has fulfilled all conditions precedent to the institution of this action, as required under Title VII.

## STATEMENT OF THE PARTIES

4. Plaintiff Kelley is an individual over the age of nineteen (19) years. Kelley is a resident of the State of Alabama.

5. Defendant Holder Construction ("Holder"), is an entity subject to suit under the statutes asserted in this lawsuit.

## STATEMENT OF THE FACTS

6. Plaintiff re-alleges and incorporates by reference the above paragraphs with the same force and effect as if fully set forth herein and further state as follows:

7. Plaintiff is an African American man.

8. Plaintiff began working on a Holder Construction project on or near September 18, 2018.

9. Plaintiff was told that he should expect to remain working on the Holder Construction project for two (2) years. This excited Plaintiff as he would have a good job and source of income for the next two years. Additionally, the worksite was very close to Plaintiff's residence.

10. The first day Plaintiff began working at the Holder worksite, he was

assigned to a specific work group and told that there were two supervisors in his group: Supervisor Billy and Supervisor Salvador.  Plaintiff was told that he should do as the supervisors instructed. As such, Plaintiff looked to Supvs. Billy and Salvador for his daily assignments and work hours.  If Plaintiff had any issues or needed direction, he was instructed to consult with one of his supervisors.

11.  On the very first day of Plaintiff's employment at the worksite, Supv. Billy yelled and cursed at Plaintiff because Plaintiff brought some drills to use at the worksite.  Supv. Billy loudly yelled "take them damn drills back, we use hammers here." Plaintiff was embarrassed at the outburst but realized it was the first day of a great job and he did not want any problems.  As such, Plaintiff put the drills away and instead used a hammer as instructed.

12.  As the days go by, Plaintiff and another employee, Brian Barnes, are continually ridiculed by other workers at the worksite either due to the quality of their tools or because Plaintiff's primary construction experience was that of a residential builder.  Seeing what was happening, Plaintiff decided to take Brian under his wing and offer whatever protection, teaching, and encouragement he could give to him. In an effort to gain more acceptance on the jobsite, Plaintiff and Brian took it upon themselves to purchase bigger hammers.  Because,

3

according to the workers at the jobsite, real carpenters had bigger hammers.

13. On or near October 9, 2018, Supv. Salvador approached Plaintiff and Brian while they were breaking down templates. Salvador told Plaintiff to turn some music off that Plaintiff and Brian were listening to while they worked. Salvador informed them that music was not allowed to be playing while they were working. As such, Plaintiff turned the music down.

14. Supv. Salvador then told Plaintiff that he needed to start showing up to work 15 minutes early if he was interested in gaining any favor from the supervisors at Holder. Plaintiff took what Supv. Salvador was saying seriously because Salvador not only supervised and directed Plaintiff's work and work assignments but he also supervised the hours that Plaintiff worked. More specifically, Salvador set Plaintiff's schedule which dictated when Plaintiff would arrive at work and what time he would leave each day. Salvador or Bill would initial and sign off on the time sheet for hours worked. These acts were necessary for Plaintiff to get paid.

15. As Supv. Salvador, Plaintiff and Brian continued to talk, Salvador asked Plaintiff what type of work he did prior to the instant work. Plaintiff responded that he built customized cabinets. Salvador immediately scoffed at Plaintiff and told him that the last guy that worked under him that did cabinetry

could not cut it doing the type of work they were doing at the Holder jobsite. He proceeded to tell Plaintiff that they had already completed the steps at the Holder jobsite before Plaintiff started working there and he presumed that would have been something that Plaintiff liked given his background. Because now, according to Salvador, they were doing "hard" work at the jobsite and Plaintiff probably could not cut it given his cabinetry background.

16. Plaintiff realized that Supv. Salvador was picking at him. However, by this time Plaintiff was not bothered by the pokes and prods he had been getting since he started working there. Perhaps Plaintiff's indifference to Salvador's thinly veiled insults caused Salvador to greatly intensify his comments.

17. Indeed, the next thing Salvador asked Plaintiff was whether he had ever heard the terms "house nigger" and "field nigger". When Plaintiff heard this his jaw dropped. Happy with finally getting a reaction from Plaintiff, Supv. Salvador proceeded to tell Plaintiff that because Plaintiff did cabinetry then he was a "house nigger" and when he did the "hard" work at the Holder jobsite then he was a "field nigger".

18. Both Plaintiff and Brian were shocked at Supv. Salvador's use of such an inflammatory and hurtful word. Plaintiff immediately told Supv. Salvador that

5

he had crossed the line and he should never say anything like that to him again. Salvador walked away with a smirk on his face.

19. Plaintiff told Brian that what just happened was not right and asked whether Brian would come forward as a witness to what took place. Brian agreed to be a witness as he was also insulted by the language used by a supervisor although it was not directed toward him specifically.

20. Other than telling Supv. Salvador that what he said was highly inappropriate, Plaintiff did not know what else he should do because something like this had never happened to him before. The following day, Plaintiff arrived to work 15 minutes early. Supv. Salvador was standing near the entrance and completely ignored Plaintiff when he walked by. Plaintiff felt the tension in the air and knew that he had to do something more than telling Salvador how he felt. At the time, Supv. Bill was not on the worksite because he went home (which was out of state) for a while. As such, Plaintiff called the Equal Employment Opportunity Commission during his break to report what he experienced. At this stage, Plaintiff was fearful for not only his job but also for his safety. Plaintiff believed that if Supv. Salvador found out Plaintiff reported him, then he would retaliate against him.

21. The week moved on and Salvador did not come back around Plaintiff

at all. Plaintiff was essentially working with no supervision. However, Salvador continued to perform his supervisory duties with all of the other workers within his purview.

22. At the end of the week, Supv. Salvador signed off on Plaintiff's timecard and told Plaintiff that Supv. Billy would be back next week. Those were the only words Salvador spoke to Plaintiff since the n-word incident.

23. The following Monday, Plaintiff reports back to work and begins breaking down templates again with Brian. Seemingly out of nowhere, Supv. Bill suddenly accosted Plaintiff and Brian. Supv. Bill loudly yelled "what are ya'll doing over here?! Looks like ya'll are collaborating over something to me!" He then pointed at Brian and yelled "if I catch the two of you collaborating again you can bet that I'm sending you home!" Supv. Bill then separated Plaintiff and Brian. This was the first time Plaintiff and Brian were separated since they started working together. Supv. Bill then made Plaintiff start working with a team of Hispanic workers. None of the Hispanic workers could speak English. As such, Plaintiff was unable to communicate with them. The rest of the week, Plaintiff was struggling to understand what was happening and exactly what they were supposed to be doing. Neither supervisor came back around Plaintiff. Plaintiff was left isolated, ignored, embarrassed and insulted. Plaintiff was certain his job

was in jeopardy and was fearful to say anything more than he had already said.

24. That weekend, Plaintiff received a phone call from Tradesmen International ("TI"), the employment agency that placed Plaintiff at the Holder jobsite. Plaintiff was informed that TI had spoken to Supv. Salvador and that he did not want Plaintiff to come back to the Holder worksite anymore. Specifically, Salvador told TI that Plaintiff was not doing a good job. As such, Plaintiff was effectively terminated from the Holder worksite.

25. Plaintiff's fear was realized. The job he was so excited to begin working had now been snatched away from him merely because he spoke up for himself when he was faced with an awful situation. Plaintiff immediately told TI what really happened and the reason for Supv. Salvador's call to them terminating Plaintiff from the worksite. TI claimed that it would look into the situation.

26. A couple of days later, TI contacted Plaintiff and said that Supv. Salvador denied calling him a "house nigger" but, instead, he had called Plaintiff a "house carpenter". TI then told Plaintiff that Holder invited Plaintiff to come back to the worksite. Plaintiff was flabbergasted. He immediately told TI that he was positive that Salvador called him the n-word and now he (Plaintiff) was experiencing retaliation as a result, and was certain it would be even more

retaliation when he returned to the worksite if nothing had changed. Plaintiff asked whether Supv. Salvador still worked there and whether any form of corrective action would be taken against Salvador. When TI confirmed that Salvador was still there, Plaintiff had to refuse the offer to go back to the Holder worksite for fear of continued retaliation. Specifically, being ridiculed, isolated, placed on work crews with whom he could not communicate, insulted, and set up for failure.

27. Since being terminated from the Holder worksite, Plaintiff has been unable to find comparable work. He has suffered extreme harm including, but not limited to, loss of employment opportunities, loss of compensation and other benefits and conditions of employment, as well as other monetary damages. Additionally, Plaintiff has suffered injury including pain, humiliation, mental anguish and suffering, and loss of enjoyment of life.

**FIRST and SECOND CAUSES OF ACTION**
**Count I - Race Discrimination - Disparate Treatment**
**Count II - Race Discrimination - Racial Harassment**
**Pursuant to 42 U.S.C. §2000e, et.seq.**
**42 U.S.C. § 1981**

28. The Plaintiff re-alleges and incorporates by reference the above Paragraphs with the same force and effect as if fully set out in specific detail herein.

29. Plaintiff is an African American man.

30. Plaintiff has been discriminated against and treated differently than similarly-situated white employees solely because of his race. Specifically, Plaintiff was called a "house nigger". Further, Plaintiff was told that when he starts doing more difficult work, he would then be a "field nigger". Similarly situated white or Hispanic employees did not have to go to work and be called any form of "nigger".

31. Further, after Plaintiff voiced his complaints about being called such an inflammatory word to Supv. Salvador and also contacting the EEOC, Plaintiff was accused of "collaborating" when he was only doing his job, he was then isolated and separated from his workmate and placed on a crew that could only speak Spanish. Plaintiff could not speak Spanish. Working on the Spanish speaking crew lasted less than a week. The very next weekend, Supv. Salvador told TI that Plaintiff was no longer welcome back on the Holder worksite.

32. Defendant is directly liable for the actions and/or inactions of its managers and agents.

33. As a result of Defendant's actions, Plaintiff has suffered extreme harm including, but not limited to, loss of employment opportunities, denial of wages, compensation and other benefits and conditions of employment, as well

as other monetary damages. Additionally, Plaintiff has suffered injury including pain, humiliation, mental anguish and suffering and loss of enjoyment of life.

### THIRD AND FOURTH CAUSES OF ACTION
### Count III - Retaliation
### Count IV - Retaliatory Discharge
### Pursuant to 42 U.S.C. §2000e, et.seq.,
### 42 U.S.C. § 1981

34. The Plaintiff re-alleges and incorporates by reference the above Paragraph Nos. 7-27 with the same force and effect as if fully set out in specific detail herein.

35. Plaintiff has been discriminated against and treated differently than similarly-situated white employees solely because of his race. Specifically, Plaintiff was called a "house nigger". Further, Plaintiff was told that when he starts doing more difficult work, he would then be a "field nigger". Similarly situated white or Hispanic employees did not have to go to work and be called any form of "nigger".

36. Plaintiff engaged in protected activity when he immediately told Supervisor Salvador that what he said was highly inappropriate and that he should never use that type of language around Plaintiff again.

37. After Plaintiff voiced his complaints about being called such an inflammatory word to Supv. Salvador, he also contacted the EEOC. Supervisor

Bill was not present at the jobsite that week, so Plaintiff was unable to complain directly to him.  However, upon his return the following week, Supervisor Bill accosted Plaintiff and accused him of being a "collaborator" with his workmate, Brian, who had also witnessed the racial harassment the prior week. Indeed, Plaintiff was loudly accused of "collaborating" when he was only doing his job, he was then isolated and separated from his workmate and placed on a crew that could only speak Spanish. Plaintiff could not speak Spanish. Working on the Spanish speaking crew lasted less than a week.  That very next weekend, Supv. Salvador told Tradesmen International that Plaintiff was no longer welcome back on the Holder worksite. As such, Plaintiff lost his Holder position.

38.     Plaintiff immediately told TI what really took place. A couple of days later, TI reported back to Plaintiff that Salvador claimed to have called Plaintiff a "house carpenter" and not a "house nigger".  TI further stated that Holder offered to put Plaintiff back to work.  However, because Holder refused to acknowledge or attempt to remediate Plaintiff's complaint and Plaintiff would have been placed back to work with Supv. Salvador, Plaintiff felt he had no other choice but to decline the offer.  Indeed, Plaintiff was certain he would face additional retaliation just as he had experienced as soon as he spoke out against Salvador's use of the racial slur.

39. All together, it only took between one to two weeks after complaining about the racial abuse that Plaintiff was terminated. Supv. Salvador's reason for terminating Plaintiff was that Plaintiff was not doing a good job. However, the reason was pretext. Plaintiff was terminated in retaliation for engaging in protected activity.

40. Defendant is vicariously liable for the actions of its supervisory employees and agents acting in the scope of their duties while discriminating and/or retaliating against Plaintiff.

41. As a result of Defendant's actions, Plaintiff has suffered extreme harm including, but not limited to, loss of employment opportunities, denial of wages, compensation and other benefits and conditions of employment, as well as other monetary damages. Additionally, Plaintiff has suffered injury including pain, humiliation, mental anguish and suffering and loss of enjoyment of life.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court will assume jurisdiction of this action and, after trial, provide relief as follows:

1. Issue a declaratory judgment that the employment practices, policies, procedures, conditions and customs that led to the discrimination and retaliation by Defendant are violative of the rights of Plaintiff as secured by,

where applicable, Title VII of the Act of Congress known as the "Civil Rights Act of 1964", as amended, 42 U.S.C. Section 2000e et seq., and 42 U.S.C. § 1981.

2. Grant Plaintiff a permanent injunction enjoining Defendant, their agents, successors, employees, attorneys and those acting in concert with Defendant and at Defendant's request from continuing to violate Title VII of the Act of Congress known as the "Civil Rights Act of 1964", as amended,, 42 U.S.C. Section 2000e et seq., and 42 U.S.C. § 1981.

3. Enter an order requiring Defendant to make Plaintiff whole by awarding Plaintiff back-pay (plus interest), reinstatement or front-pay in lieu thereof, compensation for loss of wages and benefits, lost seniority, and pension benefits and nominal, compensatory and punitive damages.

4. Plaintiff further prays for such other and further relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees, and expenses incurred by this ligation.

5. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this suit, and this action for injunctive, declaratory and other relief, is his only means of securing adequate relief.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON
ALL ISSUES TRIABLE BY JURY**

        Respectfully submitted,

        /s/ *Sidney Jackson*
        Samuel Fisher
        Sidney M. Jackson
        *Attorneys for the Plaintiff*
        **WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC**
        The Kress Building
        301 Nineteenth Street North
        Birmingham, Alabama 35203
        Telephone: (205) 314-0500
        Facsimile: (205) 254-1500
        sjackson@wigginschilds.com
        sfisher@wigginschilds.com

**Notice of Lawsuit and Request for Waiver of Service to Be Sent by Certified Mail to the Following:**

Holder Construction
c/o C T CORPORATION SYSTEM
2 NORTH JACKSON ST., SUITE 605
MONTGOMERY, AL 36104